UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

SHAMSIDEEN G. SOKOYA,
      Plaintiff,

v.          06-2219

MICHAEL DOWNEY, et al.,

MEMORANDUM OPINION AND ORDER

Before the court are the defendants' summary judgment motion [68] and the plaintiff's responses [79], [amended] response to statement of facts [87] and [amended] [89].

Standard

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Any discrepancies in the factual record should be evaluated in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). The party moving for summary judgment must show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

"Summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus.*, Inc., 325 F.3d 892, 901 (7th Cir. 2000). A party opposing summary judgment bears the burden to respond, not simply by resting on its own pleading but by "set[ting] out specific facts showing a genuine issue for trial." *See* Fed. R. Civ. P. 56(e). In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If [the nonmovant] does not [meet his burden], summary judgment should, if appropriate, be entered against [the nonmovant]." Fed. R. Civ. P. 56(e).

Affidavits must be based on the personal knowledge of the affiant and "set out *facts* that would be admissible in evidence." Fed. R. Civ. P. 56(e) (emphasis added). Personal knowledge may include inferences and opinions drawn from those facts. *Visser v. Packer Eng. Assoc., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991). "But the inferences and opinions must be grounded in observation or other first-hand personal experience. They must not be based on flights of fancy, speculations, hunches, intuitions or rumors remote from that experience." *Visser*, 924 F.2d at 659.

Background

The plaintiff, Shamsideen Sokoya alleges in this lawsuit that his constitutional rights were violated while he was housed as a pretrial detainee in Kankakee County, Illinois. Specifically, Sokoya alleges that his Fourteenth Amendment rights were violated because he faced inhumane conditions of confinement and was denied adequate medical treatment and access to the courts. Sokoya brings these claims for money damages pursuant to 42 U.S.C. § 1983 against the defendants, Michael Downey, the Chief of Corrections of Kankakee County, Carl Brown, the Assistant Chief of Corrections of Kankakee County, and Correctional Officers Cynthia Leggett, William Berry, Justin Dole, Nicholas Nagel, Kent Smith, Roosevelt Kennedy, Michael Dumontelle and Christopher Young.

The defendants have moved for summary judgment on all of Sokoya's claims and the plaintiff has filed several responses in opposition thereto. His first response [79] was filed on November 17, 2008, includes a 248-paragraph affidavit, a 61 page, single-spaced memorandum and more than 130 pages in exhibits. On November 19, 2008, the defendants filed a timely motion to strike the plaintiff's response for failure to comply with Local Rules 7.1(D)(5) and 7.1(B)(4), which limits Sokoya's response to 15 double-spaced pages or the prescribed type volume limitation. The plaintiff's memorandum is more than four times the allowed limitation under the rules. The plaintiff has not sought leave from this court to file a memorandum in excess of the limitation, nor shown good cause to be excused from comply with the local rules.

On December 15, 2008, the defendants filed a motion to strike the plaintiff's affidavit [84] attached to his response. The plaintiff filed an unsigned response [88] and therefore it will not be considered. See Fed. R. Civ. Pro Rule 11(a) which provides that every pleading, written motion, and other paper must be signed by at least one attorney of record. . . . or by the party personally if the party is unrepresented. After becoming aware through the defendants' motion to strike [82] and their reply [83] to his response that his response [79] was not in compliance with the local rules, the plaintiff filed an [amended] response [87] to the defendants' statement of facts and an [amended] "response/memorandum" [89]. The plaintiff's second memorandum is 25 pages long. Again the plaintiff did not seek leave of the court to file a memorandum in excess of the limitation.

The plaintiff's response, particularly document 79, obfuscates the true issues at stake and serves to burden the judicial system and frustrate the defendants' defense against his allegations. Sokoya's response to defendants' statement of material facts contains generalized legal argument and conclusions, rather than particularized statements of fact. His affidavit contains contradictory and hearsay statements, as well as legal argument and speculation. Sokoya's 65-page brief in opposition and hundreds of pages of exhibits (not referenced in his response to defendants' statement of facts) are used as a "veritable catapult to hurl a jumbled mass of information" at defendants and this court in the hope of avoiding summary judgment. *See Greer v. Bd. of Ed.*, 267 F.3d 723, 727 (7th Cir. 2001). It is not the function of this court to scour the record in search of facts or evidence to support Sokoya's position. "Courts are entitled to assistance from counsel, and an invitation to search without guidance is no more useful than a

2

litigant's request to a district court at the summary judgment stage to paw through the assembled discovery material. 'Judge are not like pigs, hunting for truffles buried in' the record." *Albrechtsen v. Bd. of Regents,* 2002 WL 31397690 (7th Cir. 2002), *quoting United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). The court necessarily relies on "the nonmoving party to identify with reasonable particularity the evidence upon which he relies." *Bombard v. Ft. Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996). The plaintiff attaches exhibits to both of his responses, but neither of his memorandum of law points the court to specific exhibits.

In Illinois, *pro se* litigants are presumed to have full knowledge of applicable court rules and procedure. *See Moralis v. Flageole*, No. 06 C 2034, 2007 WL 2893652, *3 (C.D. Ill. Sept. 28, 2007); *Voogd v. Pavilion Found.*, No. 03 C 2465, 2004 WL 877996, *3 (N.D. Ill. April 23, 2004) (*citing Steinbrecher v. Steinbrecher*, 197 Ill. 2d 514, 759 N.E.2d 509, 517 (2001)). Therefore, even though Plaintiff is proceeding *pro se*, he must follow the Federal Rules and procedural rules of the Central District, and this Court should enforce those rules. *See Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 562 (7th Cir. 2002); *Members v. Paige*, 140 F.3d 699, 702 (7th Cir. 1998); *Jagla v. LaSalle Bank*, No. 05 C 6460, 2006 WL 2796481, *8 (N.D. Ill. Sept. 26, 2006). The Seventh Circuit has repeatedly upheld a district court's discretion to require
strict compliance with its local rules governing summary judgment, even in the case of *pro se* plaintiffs. *See Moralis*, 2007 WL 2893652 at *3; *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000).

Under Local Rule 7.1(D)(2), a response to a summary judgment must include a response to movant's statement of undisputed material facts. Such response is to contain: (1) a list by number of each fact from the movant's statement which is conceded to be undisputed and material; (2) a list by number of each fact which is claimed to be disputed, supported byevidentiary documentation referenced by specific page; (3) a list by number of each facts which is claimed to be immaterial and the reason for such claim; and (4) a list of numbered additional material facts raised in opposition to the motion for summary judgment. *See* C.D. Ill. L.R. 7.1(D)(2). Where a party fails to respond, the movant's proposed facts are accepted as true. *See Ernst v. Mitchell*, No. 05-1080, 2006 WL 3513907, *1 (C.D. Ill. Dec. 5, 2006) (*citing* Local Rule 7.1(D)(2)). Further, the Seventh Circuit has consistently held that a failure to respond by the nonmovant as mandated by the local rules results in an admission for purposes of summary judgment. *See Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). Here, Sokoya's response to Defendants' statement of material facts (d/e 81) does not comply with Local Rule 7.1(D)(2); he does not respond particularly to each numbered paragraph nor does he identify each fact from Defendants' statement and clarify whether it is conceded to be undisputed and material, disputed and material or immaterial. Sokoya's statement is wholly disjointed, contains evasive and contradictory statements, legal conclusions and argument. Further, Sokoya's evasive denials are not supported by citations to any portion of the record nor any additional exhibits.

Neither the defendants or this court is required to make up for the plaintiff's failure to respond to the defendant's statement of facts and "wade through improper denials" and argument

in search of a genuinely disputed material fact. *Smith*, 321 F.3d at 683 (*citing Bordelon*, 233 F.3d at 529); *see U.S. v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)("Judges are not like pigs, hunting for truffles buried in" the record). Accordingly, Sokoya's response [79] to the defendants' statement of material facts is stricken in its entirety and this court accepts the material facts in Defendants' statement of facts as true, as it is entitled to under Local Rule 7.1(D)(2) and Seventh Circuit precedent. Further, Sokoya's affidavit, even if it was appropriate (and it is not) under the federal and local rules (*see* Defs.' Mot. Strike Pl.'s Aff.) cannot be considered here in light of his failure to comply with the requirements of Local Rule 7.1(D) in responding to Defendants' undisputed material facts. Therefore, this court limits its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' statements. *See Bordelon*, 233 F.3d at 529. Because Sokoya's statement is entirely non-compliant, "it does not matter that evidence may have existed in the record to create a disputed issue of fact." Id.

Statement of Undisputed Facts[1]

1. Michael Downey is the Chief of Corrections in Kankakee County, Illinois (Downey Aff., ¶ 1, attached as Exhibit A).
2. Carl Brown is the Assistant Chief of Corrections in Kankakee County, Illinois (Brown Aff., ¶ 1, attached hereto as Exhibit B).
3. Cynthia Leggett, at all times relevant to the Complaint, was employed by Kankakee County as a Correctional Officer, with the rank of Lieutenant (Id. ¶ 3).
4. William Berry, at all times relevant to the Complaint, was employed by Kankakee County as a Correctional Officer (Id. ¶ 4).
5. Justin Dole, at all times relevant to the Complaint, was employed by Kankakee County as a Correctional Officer (Id. ¶ 5).
6. Nicholas Nagel, at all times relevant to the Complaint, was employed by Kankakee County as a Correctional Officer (Id. ¶ 6).
7. Kent Smith, at all times relevant to the Complaint, was employed by Kankakee County as a Correctional Officer, with the rank of Lieutenant (Id. ¶ 7).
8. Roosevelt Kennedy, at all times relevant to the Complaint, was employed by Kankakee County as a Correctional Officer (Id. ¶ 8).
9. Michael Dumontelle, at all times relevant to the Complaint, was employed by Kankakee County as a Correctional Officer (Id. ¶ 9).
10. Christopher Young, at all times relevant to the Complaint, was employed by Kankakee County as a Correctional Officer (Id. ¶ 10).
11. Jean Flageole is the Director of Nursing for the Kankakee County Jail (Flageole Aff., ¶ 1, attached hereto as Exhibit C).
12. Laurie Eheart is employed as a nurse at the Kankakee County Jail (Eheart Aff., ¶ 1, attached hereto as Exhibit D).

---

[1] Exhibits are attached to the defendants' statement of facts [70].

13. Pursuant to an agreement between the United States Marshals Service and the Kankakee County Sheriff's Department, Shamsideen Sokoya was a federal pretrial detainee housed at the Kankakee County Jail from December 1, 2005, through January 16, 2007 (Ex. A, Downey Aff., ¶ 3; Sokoya Dep., p. 14, attached hereto as Exhibit E).
14. Sokoya was arrested on January 18, 2005, by the DEA on drug charges (Ex. E, Sokoya Dep., pp. 8, 20).
15. Sokoya was detained on those charges at the Metropolitan Correctional Center and Ozaukee County before being transferred to Kankakee County (Id. pp. 8-10).
16. Sokoya was represented by counsel during the entirety of his prosecution in the underlying criminal matter (Id. pp. 10, 14).
17. Sokoya was housed at the Kankakee County Detention Center ("KCDC") from December 1, 2005, to April 4, 2006 (Ex. A, Downey Aff., ¶ 4).
18. Sokoya was housed in 2 SW from December 1 to December 10, 2005, and from February 17 to March 20, 2006 (Id. ¶ 4).
19. Sokoya was housed in 3 NW from December 10, 2005, to February 11, 2006 (Id. ¶ 4).
20. Inmates housed in all units at both KCDC and the Jerome Combs Detention Center ("JCDC") are provided with cold milk and/or juice each day when they are served with breakfast, lunch and dinner (Id. ¶ 11).
21. A water fountain is accessible to inmates in every day room at the KCDC; also, an inmate may receive additional drinking water in his cell upon request (Id. ¶ 11).
22. The KCDC and JCDC inmate handbooks explicitly provide that the grievance procedure in Kankakee County requires that an inmate submit a grievance written on an Inmate Grievance Form to correctional staff regarding complaints about jail conditions (Id. ¶ 8).
23. Grievance Forms are created in carbon-copy, so that the inmate keeps a copy of the written grievance for himself while submitting the original to correctional staff (Ex. A, Downey Aff., ¶ 8).
24. Downey did not receive a grievance from Sokoya complaining about not having enough water to drink during his detention at KCDC or JCDC; there is no record at the Kankakee County Jail that Sokoya, while an inmate, ever requested additional drinking water (Id. ¶ 12).
25. Sokoya was housed in 3 NE from February 11 to February 17, 2006 (Id. ¶ 4).
26. Sokoya was housed in G SW from March 20 to April 4, 2006 (Id. ¶ 4).
27. In G SW, Sokoya was housed in a cell for three days with a defective toilet; when the inmate next to him defecated and flushed, the substance would come into his (Sokoya's) toilet (Ex. E, Sokoya Dep., pp. 32-34, 44).
28. Sokoya waited to speak with Lieutenant Leggett about the problem and was moved to another cell in G SW that same day (Id. pp. 44-46, 55).
29. Sokoya was able to flush his toilets in G SW to rid them of any contents (Id. pp. 35-36, 71).
30. Sokoya's toilets in G SW did not overflow (Id. p. 35).
31. Sokoya did not request to see the nurse for stomach irritation or any other injury as a result of a defective toilet (Id. p. 55, 73).
32. Downey did not receive a grievance from Sokoya complaining that the toilet in his cell was not working properly at any time during his detention at KCDC or JCDC; there is no

   record at the Kankakee County Jail that Sokoya, while an inmate, ever grieved the fact that the toilet in his cell was not working properly (Ex. A, Downey Aff., ¶ 10).
33. Even though his new cell in G SW was an isolation cell, Sokoya was not in isolation nor was he there for discipline, Sokoya was able to go into the day room with the general population on a daily basis when he so requested (Ex. E, Sokoya Dep., pp. 59-60, 62-65, 68).
34. On occasion, Sokoya was not able to go into the general population at the exact moment that he wanted to because an officer was not there to open his cell (Ex. E, Sokoya Dep., pp. 66-67).
35. Sokoya stayed in the isolation cell for nine days (Id. p. 57).
36. Sokoya was moved to the JCDC on April 4, 2006, and was housed in administrative segregation, Block Max B, until August 9, 2006 (Ex. A, Downey Aff., ¶ 5).
37. Sokoya was not moved or placed in administrative segregation as punishment for any misconduct; he was housed in administrative segregation for his protection and the protection of other inmates because of his problems getting along with inmates and correctional officers, to secure the safe and effective operation of the jail (Id. ¶ 5).
38. Downey did not receive a grievance from Sokoya complaining about his placement in segregation at any time during his detention at KCDC or JCDC; there is no record at the Kankakee County Jail that Sokoya, while an inmate, ever grieved the fact that he was improperly housed in segregation (Id. ¶ 9).
39. Inmates in Max B are provided a private bed, toilet and sink, and three meals per day, and are allowed one hour each day out of their cell to watch television, use a telephone, exercise and shower (Ex. B, Brown Aff., ¶ 13).
40. While Sokoya was housed in Max B, work was done in the Max A and Max D housing units to install intercoms for inmate use (Ex. A, Downey Aff., ¶ 16, Ex. E, Sokoya Dep., p. 75).
41. The inmates who were housed in both the Max A and Max D units were transferred to other parts of the jail while this work was being done for the protection of workers who were using power tools for the installation (Ex. A, Downey Aff., ¶ 16; Ex. E, Sokoya Dep., p. 75).
42. The housing units in Max are separated by glass; each unit contains cells that are also completely closed off (Ex. E, Sokoya Dep., pp. 77-78).
43. Downey was not told, nor did he know, before the work was done or while it was being carried out that there was any safety concerns for inmates in the other Max housing units (Ex. A, Downey Aff., ¶ 16).
44. Sokoya was moved back to the KCDC and housed in 2 SW from August 9 to August 11, 2006 (Id. ¶ 6).
45. Sokoya was housed in 2 NW from August 11 to December 1, 2006, where he was on lock-down awaiting an administrative hearing on charges of disrespect to correctional officers (Id. ¶ 6).
46. Sokoya was housed in 3 SW from December 4 to December 6, 2006 (Id. ¶ 6).
47. Sokoya was transferred to the JCDC on December 6, 2006, and was housed in Block KA Pod until January 16, 2007, at which time he was transferred to the Metropolitan Correctional Center ("MCC") in Chicago (Id. ¶ 7).

48. Inmates housed in 2 SW, 3 NW and 3 NE at the KCDC are general population inmates and are provided with a private bed, toilet and sink, and three meals a day, and are allowed time out of their cells throughout the day except during the times that general population inmates were on lock-down (Ex. B, Brown Aff., ¶ 4).
49. General Population inmates at the Kankakee County Detention Center ("KCDC") and Jerome Combs Detention Center ("JCDC") are placed on a "lights-out" lock-down from 10 p.m. each day until 8 a.m. the following day; inmates are also placed on lock-down for an hour each during lunch and dinner so that correctional officers may clean up and complete administrative paperwork (Id. ¶ 3).
50. Sokoya was placed on 48 and 72 hour lock-downs on a few occasions in 2006 for violating jail rules and procedures. (Ex. E, Sokoya Dep., pp. 84, 86, 88, 89, 94, 101, 103).
51. The Kankakee County Inmate handbook instructs inmates to complete a Sick Call Slip if they need medical care and wish to be placed on the sick call list (Ex. C, Flageole Aff., ¶ 3; Ex. D, Eheart Aff., ¶ 2).
52. The Sick Call Slip specifically states that an inmate will not be denied medical care because he cannot pay; an inmate who does not have any funds in his account will be seen by medical staff and a negative balance would be placed on his account (Ex. C, Flageole Aff., ¶ 3; Ex. D, Eheart Aff., ¶ 6).
53. Sokoya submitted a Sick Call Slip on January 23, 2006, complaining of an injury to his shoulder, neck and back and occasional blurry vision and severe headaches (Ex. D, Eheart Aff., ¶ 3; Ex. E, Sokoya Dep., p. 108).
54. Sokoya was examined by Nurse Laurie Eheart later in the day on January 23, 2006 (Ex. D, Eheart Aff., ¶ 4).
55. Nurse Eheart checked Sokoya's vital signs, which were all normal (Id. ¶ 4; Ex. E, Sokoya Dep., p. 109).
56. Sokoya told Eheart that he had previously tested positive for TB but that the chest x-ray that had been taken was negative (Ex. D, Eheart Aff., ¶ 4).
57. Sokoya told Eheart that he was not on any medication (Id. ¶ 4).
58. Sokoya complained to Nurse Eheart that he still had pain in his shoulders, neck and back as a result of an injury from February 2005 (Id. ¶ 4).
59. Sokoya did not tell Eheart that he had been treated by a doctor following this injury or that any treatment plan was prescribed (Id. ¶ 4).
60. Sokoya also complained of occasional blurred vision and severe headaches (Id. ¶ 4).
61. Nurse Eheart placed Sokoya on the sick call list to be seen by a doctor the next day, January 24, 2006 (Id. ¶ 3; Ex. E, Sokoya Dep., p. 111).
62. On January 24, 2006, when Sokoya was brought to the medical department to be seen by a doctor, he did not want to sign the doctor's slip for treatment and refused the doctor's exam because he did not want money to be deducted from his account, even though he had money in his account (Ex. C, Flageole Aff., ¶ 5; Ex. E, Sokoya Dep., pp. 112-114).
63. On June 8, 2006, Nurse Eheart received a call from a correctional officer who told her that Sokoya was complaining of pain in his lower back and had difficulty moving his legs (Ex. D, Eheart Aff., ¶ 5).
64. Nurse Eheart offered to put Sokoya on the doctor's list but Sokoya refused to be seen by the doctor (Id. ¶ 5).

65. The next medical request received by the nursing department from Sokoya was dated May 1, 2006; it was written on a Corrections Division request form and included Sokoya's complaint of throat irritation due to inhaling a substance while repairs were being done in housing unit Max A (Ex. C, Flageole Aff., ¶ 6; Ex. E, Sokoya Dep., p. 115).
66. Flageole responded to Sokoya's request on May 4, 2006, and instructed him to fill out a proper Sick Call Slip if he wanted to be seen by the doctor (Id. ¶ 6).
67. The nursing department never received a Sick Call Slip from Sokoya regarding throat irritation during his detention in Kankakee County (Ex. C, Flageole Aff., ¶ 6; Ex. E, Sokoya Dep., p. 83).
68. Sokoya did not want to submit a Sick Call Slip because money would be deducted from his account for the doctor's visit (Ex. E, Sokoya Dep., p. 115).
69. The nursing department did not receive another medical request from Sokoya until October 5, 2006; on a Corrections Division request form, Sokoya requested medical treatment for his ankle, back and wrist (Ex. C, Flageole Aff., ¶ 7).
70. Flageole responded to Sokoya's request on October 10, 2006, and instructed him to fill out the proper Sick Call Slip to be treated by the doctor (Id. ¶ 7; Ex. E, Sokoya Dep., p. 116).
71. Sokoya did not want to submit a Sick Call Slip because he did not want money to be taken out of his account (Ex. E, Sokoya Dep., p. 117).
72. After the initial Sick Call Slip dated January 23, 2006, the nursing department did not receive a Sick Call Slip from Sokoya requesting medical treatment for pain in his back, shoulders or neck during his detention in Kankakee County (Ex. C, Flageole Aff., ¶ 8).
73. Downey did not receive a grievance from Sokoya complaining about not receiving any requested medical treatment during his detention at the KCDC or JCDC (Ex. A, Downey Aff., ¶ 13)
74. On September 28 and October 4, 2006, Sokoya submitted grievances to Downey requesting information regarding the prosecutor's claim in his criminal trial that he (Sokoya) had refused medical treatment (Id. ¶ 13).
75. Downey contacted Flageole, who told him that Sokoya refused to submit a Sick Call Slip to see the doctor because he did not want to pay for the doctor's visit, and that he had been told to submit a Sick Call Slip if he wanted medical treatment (Id. ¶ 13).
76. On October 16, 2006, Downey responded to Sokoya's grievance and informed him that in order to receive medical treatment he would have to submit a Sick Call Slip, which he had already been advised numerous times (Id. ¶ 13).
77. Downey also spoke with a U.S. Marshal, who was following up on complaints Sokoya made to the judge in his criminal case, and informed him that Sokoya had not submitted a Sick Call Slip to the medical department requesting treatment because he did not want money taken from his account to pay for medical care (Id. ¶ 14).
78. Downey was not contacted again by the U.S. Marshals regarding Sokoya's medical care (Id. ¶ 14).
79. Neither Downey nor the nursing department received a request or grievance from Sokoya regarding a Judge's Order for medical treatment (Ex. A, Downey Aff., ¶ 15; Ex. C, Flageole Aff., ¶ 10; Ex. D, Eheart Aff., ¶ 7).

80. Neither Downy nor the nursing department received a copy of any Order entered by the judge presiding over Sokoya's criminal trial (Ex. A, Downey Aff., ¶ 15; Ex. C, Flageole Aff., ¶ 10; Ex. D, Eheart Aff., ¶ 7).
81. Sokoya did not submit a Sick Call Slip after complaining to the judge in his underlying criminal matter for treatment because he did not want money deducted from his account (Ex. E, Sokoya Dep., pp. 127-128).
82. Inmates at both KCDC and JCDC may order through the commissary paper, stamped envelopes and writing utensils (Ex. A, Downey Aff., ¶ 17; Ex. E, Sokoya Dep., p. 132).
83. Sokoya did have a pencil and paper to write on. On a couple of occasions, Sokoya requested to be given envelopes in order to send out legal mail and was provided with the envelopes as requested (Ex. A, Downey Aff., ¶ 17; Ex. E, Sokoya Dep., p. 129, 133, 134).
84. Sokoya's counsel had a copy of "discovery tapes" relative to the underlying criminal prosecution (Ex. E, Sokoya Dep., pp. 138, 141, 145).
85. Downey did not receive a grievance from Sokoya complaining about his not receiving "discovery tapes" relative to his criminal prosecution or any problems he may have had accessing legal material; there is no record at the Kankakee County Jail that Sokoya, while an inmate, ever grieved the fact that he did not receive "discovery tapes" when asked or any problems had may have had accessing legal materials (Ex. A, Downey Aff., ¶ 19).
86. **On May 8, 2006, Sokoya submitted a grievance to Downey in which he complained that his legal mail had been opened before it was given to him (Id. ¶ 18).**
87. Downey responded to Sokoya's grievance and informed him that legal mail is to be opened only in the presence of an inmate but that there are times when an inmate's mail is inadvertently opened by the County's Civil Process Clerk and then forwarded to the jail when the Clerk realizes the mail belongs to an inmate (Id. ¶ 18).
88. Because Civil Process receives such a large quantity of legal mail itself, an inmate's legal mail may be inadvertently mixed-in while the mail is being sorted (Id. ¶ 18).
89. Sokoya did not miss any court appearances while detained in Kankakee County (Ex. E, Sokoya Dep., p. 157).
90. Sokoya had access to his counsel in the criminal prosecution while detained in Kankakee County and received correspondence from him through the mail (Id. pp. 157-158).
91. Sokoya pled guilty to the charges he faced in the underlying criminal prosecution (Id. p. 13).
92. Sokoya is currently a prisoner at the Eden Correctional Center in Eden, Texas (Id. pp. 6-7).

Discussion and Conclusion of Law

The court first address the issue of failure to exhaust administrative remedies. The defendants argue that summary judgment should be granted because Sokoya did not exhaust the administrative remedies available to him. The Prisoner Litigation Reform Act ("PLRA") states that "no action shall be brought with respect to prison conditions under Section 1983 ... by a prisoner confined in any jail, prison or other correctional facility until such administrative

remedies as are available are exhausted." 42 U.S.C. § 1997e(a) (West 2006).  To this extent, the PLRA seeks to afford correctional officials time and opportunity to address complaints internally before allowing the initiation of a lawsuit.  *See Woodford v. Ngo*, 548 U.S. 81, 93, 126 S. Ct. 2378, 2387 (2006).  Thus, two main objectives are satisfied: (1) the jail is allowed to correct its own mistakes before being haled into court and (2) the claim may be resolved much more quickly and economically. See id. at 89.  To exhaust administrative remedies, an inmate must file complaints and appeals in the place and at the time the prison's administrative rules require. See *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002). Such exhaustion is mandatory, even when the relief sought cannot be granted by the administrative process. *See Woodford*, 548 U.S. at 85.  The inmate is required to give the prison administration an opportunity to fix the problem or to reduce the dangers complained about even if he is not fully satisfied by the prison's solution. *See Pozo*, 286 F.3d at 1024.

The grievance procedure in Kankakee County, as outlined in the Inmate Handbook, requires an inmate to submit to a member of the Corrections Staff a written grievance specifically
detailing an alleged condition.  Here, the record contains no evidence that Sokoya submitted a single grievance for any of the alleged constitutional violations, except for the opening of legal mail outside of his presence.  While Sokoya claims that he submitted numerous grievances, there is no record of such grievance in the possession of Defendants and no such grievances were produced to Defendants by Sokoya during discovery.  Because Inmate Grievance Forms are created in carbon-copy duplicate, Sokoya presumably kept in his possession copies of grievances he submitted.  The record in this case, however, is devoid of such evidence.  Because Sokoya did not avail himself of the grievance procedure available in Kankakee County regarding his constitutional claims, Defendants did not have an opportunity to address Plaintiff's complaints internally and possibly correct any mistakes as to his alleged inhumane conditions of confinement, denial of access to court, property being taken, and medical care, these claims are dismissed for failure to exhaust administrative remedies.

The court now turns to the one remaining claim – opening of his legal mail.  The fact that some legal mail may have been opened outside of Sokoya's presence does not give rise to a constitutional violation. The record shows that, had any legal mail been opened outside of Sokoya's presence, it was done so inadvertently and not by Defendants (Id. ¶¶ 87, 88). Such negligence is not actionable under § 1983.  *See Kincaid v. Vail*, 969 F.2d 594, 602 (7th Cir. 1992).  Most important, an individual is liable under § 1983 only if he or she was "'personally responsible for the deprivation of a constitutional right.'" *Sanville v. McCaughtry*, 266 F.3d 724, 739 (7th Cir. 2001), *citing Chavez v. Illinois State Police*, 251 F.3d 612, 652 (7th Cir. 2001); *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995).  Personal responsibility means participating directly in the constitutional violation or directing the unconstitutional conduct.  That did not occur in this case.

IT IS THEREFORE ORDERED:

10

1. The defendants' summary judgment motion [68] is allowed. The clerk of the court is directed to enter judgment in favor of the defendants and against the plaintiff pursuant to Fed. R. Civ. P. 56. The case is terminated. Any remaining matters are rendered moot. The parties are to bear their own costs.
2. If the plaintiff wishes to appeal this dismissal, he may file a notice of appeal with this court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal. *See* Fed. R. App. P. 24(a)(1)(C). If the plaintiff does choose to appeal, he will be liable for the $455.00 appellate filing fee irrespective of the outcome of the appeal. Furthermore, if the appeal is found to be non-meritorious, the plaintiff may also accumulate a strike under 28 U.S.C. 1915(g).

Enter this   20th  day of March 2009.

**s\Harold A. Baker**

_____
Harold A. Baker
United States District Judge